Filed
D.C. Superior Court
10/22/2020 09:58PM
Clerk of the Court

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

**EXHIBIT 1**

**DANIEL WEBSTER,**
**PO Box 42124**
**Washington, DC 20015**

        **Plaintiff,**

   v.

**BANK-FUND STAFF FEDERAL CREDIT UNION,**
**1725 I Street NW**
**Suite 150**
**Washington, DC 20006**

 **Serve:**

    **Eli Vazquez**
    **Chief Executive Officer**
    **Bank-Fund Staff Federal Credit Union**
    **1725 I Street NW**
    **Suite 600**
    **Washington, DC 20006,**

       *Defendant.*

Civil Action No. _____

**JURY TRIAL DEMANDED**

**2020 CA 004399 B**

## COMPLAINT FOR EQUITABLE
## AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

### INTRODUCTION

Plaintiff Daniel Webster brings this complaint of unlawful discrimination and retaliation in violation of the District of Columbia's Family and Medical Leave Act ("DCFMLA"), D.C. Code §§ 32-501, *et seq.*, the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01, *et seq.*, and the Federal Credit Union Act 12 U.S.C. § 1790b(a)(1), *et seq*, against Defendant Bank-Fund Staff Federal Credit Union ("BFSFCU").

**PARTIES**

1.      Webster is a citizen of the United States and is a citizen of the District of Columbia.

2.      Webster is an employee of Bank-Fund Staff Federal Credit Union.

3.      Bank-Fund Staff Federal Credit Union is a credit union with its headquarters in the District of Columbia.

**JURSIDCTION AND VENUE**

4.      This Court has subject matter jurisdiction over this action because it is an action that arises, in part, under the laws of the District of Columbia, namely, the DCFMLA, D.C. Code §§ 32-501, *et seq.*, and the DCHRA, D.C. Code §§ 2-1401.01, *et seq.* Additionally, it has jurisdiction over the action that arises under the Federal Credit Union Act because it is a court of general jurisdiction.

5.      This Court has personal jurisdiction over BFSFCU because BFSFCU has its headquarters and principal place of business in the District of Columbia.

6.      Venue is proper in this Court because the unlawful employment practices occurred in the District of Columbia and because the Parties are citizens of the District of Columbia.

**FACTUAL ALLEGATIONS**

7.      Webster began working for BFSFCU in or about October 2014 and currently is an Asset and Liability Manager.

8.      In about August 2017, Webster sought the advice of an orthopedist for medical issues with his foot related to pain during weight-bearing activities. At that time, Webster also had problems with the stability of his ankle related to an injury he had sustained years earlier.

9.      Eli Vazquez is BFSFCU's chief executive officer, and he has been CEO since about October 2013. Vazquez is responsible for many of BFSFCU's investment security purchase decisions. BFSFCU's Treasurer, Charles Bangert, is responsible for the oversight and execution of much of Vazquez's investment strategy. Todd Aspell, who was BFSFCU's Chief Financial and Strategic Officer from about June 2018 until about September 2020, and is now the Senior Vice President of Finance also oversees investment purchases. David D'Annunzio has been the Chief Financial and Strategic Officer since about September 2020.  Vazquez receives directives from the Board of Directors to guide his purchase decisions, and the Board and BFSFCU require Vazquez to adhere to them.

10.      In or about December 2017, BFSFCU's Board of Directors instructed Vazquez that he should focus on low-risk, medium-term securities.  More specifically, the Board directed that Vazquez should focus on investments in United States Treasury Notes (USTNs) that were two-years to maturity.

11.      In or about February 2018, which was the same month that the Chief Financial and Strategic Officer role at BFSFCU became vacant, Vazquez began to invest in USTNs that were six months to a year to maturity. Thereafter, Webster disclosed concerns to Bangert and Aspell on several occasions throughout 2018 and 2019 that he believed Vazquez's investment strategies violated the Board's directives.

12.      In or about August 2018, Webster approached several former members of the Board of Directors. In doing so, Webster hoped to obtain advice about how to appropriately raise his concerns about the investment activity to current members of the Board.  Those former Board members were reluctant to become involved and did not provide Webster with any advice on how to raise his concerns.

13.     In or about September 2018, the Credit Union's Board of Directors instructed Vazquez to focus on low-risk, long-term securities. More specifically, the Board directed that Vazquez should focus on investments in USTNs that were three-years to maturity and include other longer-term securities.

14.     But Vazquez's budget proposal directed investment in shorter-duration, lower-yielding securities. Specifically, it directed investment in one-year to two-year USTNs and other short-term securities.

15.     In or about November 2018, Webster informed Bangert and Aspell that this proposal from Vazquez violated the Board's explicit directive.

16.     Vazquez then approved and ordered the lower-yield investments in November 2018. Later, in about December 2018, Vazquez directed Bangert to violate the Credit Union's Investment Policy by investing 300 million dollars in primarily one-year and two-year USTNs and a smaller portion in short to medium term securities without the Board's explicit prior approval. This directive violated the Bank-Fund Staff Federal Credit Union's Investment Policy, which required that the Board of Directors must specifically approve any investment that exceeded 250 million dollars in any given month.

17.     Throughout 2018 and early 2019, Webster repeatedly informed Bangert and Aspell that he had concerns about the company's investment portfolio. Specifically, Webster disclosed that the investment portfolio was "too short," which meant that the portfolio contained too many shorter-duration, low-yield investments. Further, Webster also reiterated that Vazquez's strategy that had led to the status of the investment portfolio directly contradicted the instructions that the Board had given to Vazquez.

18.      In January 2019, in response to Webster's protests, Vazquez restricted Webster's access to data which would allow him to forecast growth of credit union capital. This action frustrated Webster's ability to do his job, and it also impeded his ability to understand the financial impact of the investment decisions made by Vazquez. Then, Bangert, Vazquez, and Aspell began to exclude Webster from meetings about a "data warehouse" that would have aggregated data for analytics used by Webster.

19.      Throughout early 2019, Vazquez also ordered changes in Board agendas and Board minutes to support his unauthorized investment activities.

20.      Around March 2019, an internal audit revealed the $300 million investment from the previous year which had not received Board approval. A review of the investment portfolio also revealed that the portion of the Credit Union's portfolio managed by PIMCO, an external firm, performed significantly better than the portion managed by Vazquez.

21.      Vazquez withheld the audit report from the Board. Vazquez also directed Bangert to write a memorandum to justify the termination of PIMCO as an investment manager for the Credit Union to avoid disclosing the superior performance of the third-party investment manager.

22.      On or about March 17, 2019, Webster sent an email to Bangert and Aspell in which he opposed the decision to fire PIMCO and stated that there was no justification for the recommendation.

23.      In or about June 2019, financial models managed by Webster revealed that the Credit Union had lost about 2.3 percentage points of its economic capital, which translated to about 115 million dollars, in the past year. In response to these losses, Vazquez ordered Webster to remove some of the controls from the modeling process, and Vazquez directed that Bangert

and Webster should plug different assumptions into the models. Among these changes were adjustments to certain values that reflected a gain of about 125 million dollars for the Credit Union instead of the loss. The prior assumptions for those values had been employed by the institution for more than five years. Vazquez ordered the drastic change to the model assumptions for the sole purpose of demonstrating a misleading financial result. Even though it is standard procedure to brief the Board of Directors about model assumption changes, Vazquez never disclosed the full extent of these changes to the Board.

24.     During that same month, Webster received a mid-year performance review of 3.69 out of 5. In the prior two years, Webster had averaged a rating of 4.46 out of 5 and had not received a rating below 4.

25.     In or about July 2019, Webster returned to his orthopedist due to significant pain in his ankle. Webster's orthopedist discovered that the ligaments in Webster's ankle had weakened significantly. Webster also received a diagnosis of a partial tear in the peroneal tendon. Webster's orthopedist advised that he should have surgery to correct the issues in his ankle.

26.     That same month, Vazquez met with the Board of Directors. Vazquez lobbied the Board to abolish sections of its Investment Policy. Vazquez's requested changes included the section of the policy that otherwise restricted Vazquez from making investments of more than $250,000,000 without prior board approval.

27.     Around the same time, Vazquez finally disclosed the internal audit from March 2019 to the Board.

28.     In or about August 2019 Webster met with Bangert and discussed his need for surgery on his ankle. At the time of the meeting with Bangert, Webster believed that the period

of leave he would need would be only a few weeks. In this interaction, Bangert made a statement to the effect that it was "probably better to get this addressed now."

29.     In or about September 2019, Vazquez ordered staff members to discontinue work on an analysis of investments that would be presented to the Board in an upcoming meeting. Vazquez also directed Bangert to remove a discussion of investment benchmarks in the agenda for the upcoming meeting. The Board had specifically requested this benchmark discussion at a prior meeting. These actions were consistent with Vazquez's previous efforts to conceal the truth about the Credit Union's investments from the Board.

30.     Webster formally requested medical leave in September 2019 and initially put the end date for the leave as "TBD." In mid-September 2019, Webster's orthopedist certified the medical leave with an approximate date of return listed for February 1, 2020, which the orthopedist said represented a worst-case scenario.

31.     Webster provided the certification to his assigned HR representative, Denise Searles, and Webster asked if he needed to include more specific detail about his leave request or update his leave request form. Searles advised that BFSFCU would not require more detail and suggested that Webster should speak with Bangert. Webster then met with Bangert about the new estimate of his medical leave end date. Bangert expressed surprise and made a statement to the effect of "I hope it doesn't take that long to heal." BFSFCU ultimately approved the leave as Webster had requested it on September 25, 2019.

32.     Webster began his medical leave on or about October 1, 2019, and he had surgery on his ankle that same day.

33.     On or about October 23, 2019, Webster received an email from HR representative Kim Whittington. The email, which came almost 30 days after BFSFCU approved

Webster's leave request, advised that Webster's initial request for medical leave was "too vague" and inquired whether Webster might be able to work from home during his period of recovery. The email also inquired about a possible accommodation so that Webster might either work remotely or come back to work. Whittington further stated that BFSFCU had attempted to contact Webster's physician, but it had been unsuccessful in doing so.

34.     Webster responded to the correspondence on about October 28, 2019 and stated that he would discuss possible accommodations or remote work options with his orthopedist at his next appointment, as he was supposed to have a follow-up appointment in early November 2019.

35.     On or about October 29, 2019, Vice President of Human Resources Jennifer Kuhn contacted Webster and informed him that BFSFCU would now demand that Webster seek a second opinion from an approved list of doctors within a short time frame. Webster responded to Kuhn on or about November 1, 2019. In that email, Webster asked Kuhn to reconsider the request for a second opinion. However, on or about November 5, 2019, Kuhn reiterated BFSFCU's request.

36.     Webster consulted with a second physician who had been approved by BFSFCU, Dr. Panagiotis Labropoulos, on or about November 6, 2019. Labropoulos expressed surprise and confusion that someone had come to him for a second opinion when Webster was already in a cast and healing. Dr. Labropoulos concurred in large part with Webster's orthopedist's treatment regimen and estimated that Webster's return-to-work date might likely be closer to January 1, 2020. Dr. Labropoulos did not consider the February 1, 2020 estimate to be unreasonable, but he opined that he thought it was a worst-case scenario.

37.     Webster sent the second opinion certification form signed by Dr. Labropoulos to HR on or about November 7, 2019, and HR then approved Webster's FMLA leave again on or about November 18, 2019.

38.     On or about December 23, 2019, Webster received an email from HR representative Kim Whittington. Whittington advised that Webster's FMLA leave would soon expire and that, as per Dr. Labropoulos's certification, BFSFCU expected Webster to return to work on January 1, 2020. Whittington demanded a certification for return to work from Webster's physician. Webster later received the requested certification from his physician on or about December 30, 2019, and he sent it to HR.

39.     On or about December 27, 2019, Webster received a letter from Kuhn, dated December 16, 2019. The letter advised that Webster's 2019 evaluation had dropped to an overall rating of 2.87. This lowered rating entitled Webster to a one percent bonus when he would otherwise have received a 20 percent bonus. The letter also informed Webster that he would not receive a merit increase in pay for the year.

40.     Webster returned to work on January 3, 2020. He contacted Kuhn and expressed concerns about his performance evaluation. Specifically, Webster told Kuhn that he believed the evaluation was the result of retaliation for his use of medical leave. Webster then reiterated his concerns to Kuhn in an email on or about January 7, 2020. Webster also told Kuhn that he had realized that the original evaluation had been completed by November 27, 2019, had then subsequently been cancelled by HR, and had later been updated on December 20, 2019, which was after the date on the compensation letter.

41.     Webster filed an internal whistleblower complaint with the Credit Union's Ethics Department on January 14, 2020, in which he detailed the issues he had raised since

2018 regarding Vazquez's investment strategy and his efforts to hide the strategy and its effects from the Board.

42.      On or about January 14, 2020, Webster met with Bangert and discussed his evaluation. Bangert declared that Webster received his low review because Webster's subordinate purportedly could not perform his job duties in his absence and that "a manager must be available at all times when he is out." Bangert also expressed frustration that he had been required to assume extra duties during Webster's medical leave.

43.      On or about February 4, 2020, Denise Searles from HR contacted Webster and asked that he approve his performance review. Webster declined and said that it contained inaccuracies and that he believed his medical leave played a role in the lowered performance review. Kuhn then took over communications on behalf of HR later that day. Kuhn told Webster that she had not received any documentation from him as to why his review was inaccurate.

44.      On or about February 7, 2020, Webster responded to Kuhn and included examples of his positive performance in 2019. Webster also reiterated his concern that his use of medical leave had played a role in the lowered performance review.

45.      On or about February 10, 2020, Kuhn informed Webster that she was in the process of "researching" his complaints. Kuhn responded to Webster again on or about February 21, 2020. Kuhn informed Webster that, after she interviewed Bangert and Aspell, she found Webster's claims unsubstantiated and noted that Bangert had provided her with new information that had not been included previously in Webster's performance review.

46.      On or about February 25, 2020 Webster responded to Kuhn's correspondence. In that email, Webster detailed what he believed to be inaccuracies in Kuhn's investigation, and he questioned the completeness of the investigation because he had never been interviewed as a

part of it. Webster further questioned what he perceived to be new evidence of alleged poor performance that he had not seen, namely information from Aspell and Bangert and interviews of Aspell and Bangert. Later that day, Kuhn reiterated her conclusion and stated that both the investigation and the performance review would be closed.

47.      On or about February 26, 2020, Webster discovered that a document on his Credit Union personal drive had been opened more recently than he last remembered accessing it. After Webster contacted IT, he learned that Bangert, Vazquez, and Arias had been given access to his drive and his email while he was on medical leave. He also learned that the request for this access had come from HR on or about October 24, 2019.

48.      As one of his duties, Webster provides performance goals to Bangert in the beginning of the year. Webster's goals depend upon Bangert's goals by virtue of their working relationship.

49.      In or about April 2020, Webster discussed updated goals with Bangert and Aspell. At the meeting, Bangert provided a list of possible goals. Bangert did not detail his own goals with specificity.  In addition, in regard to Webster's years goals, Aspell instructed Webster to "leave them more broad," and "not get into specifics of who, where, and why."

50.      On April 10, 2020, Webster submitted a complaint to the National Credit Union Administration Board in which he detailed suspected violations of the Federal Credit Union Act by BFSFCU.

51.      On April 30, Aspell replaced Webster's name on a memorandum that Webster drafted after Aspell made a minor addition at the end of the memo.

52.      On or about May 6, 2020, Webster informed BFSFCU of his intention to file suit for violations of DCFMLA and DCHRA.

53.     On or about May 7, 2020, during a team meeting, the Credit Union opted to obtain four forecasting scenarios from its forecasting service provider, ALM First. Bangert designed the first three scenarios and opted to complete them during the meeting.  Bangert assigned Webster to complete the fourth scenario.

54.     On May 13, 2020, Webster received an assignment to complete a fifth scenario.

55.     On May 14, 2020, Webster submitted an email to the Finance Committee of BFSFCU which outlined governance shortcomings, the NCUA's risk assessment of the Credit Union, and opportunities to improve the performance of the investment portfolio.

56.     On May 18, 2020, in a meeting between Vazquez and Bangert, Vazquez ordered Bangert to implement twice-daily updates with all of Bangert's staff.

57.     On or about May 18, 2020, Bangert sent an email to Webster. In that email, Bangert required Webster to send emails twice daily that would detail all work Webster had done or would do that day "until [Webster] hear[d] back from [Bangert] that it is no longer a requirement."

58.     Bangert required Webster to send the first email before noon, which would outline Webster's work during the first half of the day. Then, Webster had to provide an email at the end of the day with updates from the rest of the day.

59.     These updates took Webster about 45 minutes to an hour to complete each workday.

60.     Later that same day, Bangert informed Webster that at the end of April, when the yearly goals were due at the Credit Union, Webster had provided insufficient yearly goals for himself and for Omkar Vandara, Webster's subordinate.

61.     The goals that Webster submitted depended on Bangert's vague objective descriptions. Thus, any lack of specificity came from Bangert's own lack of specificity and Bangert's own instruction to draft goals more broadly.

62.     In his first May 18, 2020 email, Bangert also stated that Webster had provided insufficient support to all the ALM First scenarios and that the project would not conclude on schedule due to Webster's purported deficient performance.

63.     Webster informed Bangert that he had not been assigned three of the five scenarios, and Webster also stated that he did not have the detail to guide those scenarios. Webster requested additional detail for the remaining scenarios to communicate to ALM First.

64.     On or about May 19, 2020, upon information and belief, Vazquez scheduled a meeting to follow up with Bangert regarding Vazquez's order to implement twice-daily updates with all of Bangert's staff.

65.     Bangert did not require any employees other than Webster to draft twice-daily reports to their supervisors.

66.     On or about May 22, 2020, Webster received clarity on Bangert's goals. He then submitted updated goals thereafter.

67.     On or about May 22, 2020, BFSFCU announced that NCUA investigators would examine the Credit Union on or about June 1, 2020.

68.     On or about May 22, 2020, BFSFCU denied Webster access to his office because his job function purportedly did not require on-site access. The Credit Union also denied Webster's request for ongoing access on or about the following dates: May 22, 2020, June 3, 2020, June 4, 2020, June 9, 2020, June 24, 2020, July 31, 2020, and October 8, 2020.

69.      In or about June 2020, Webster noticed another example of the Credit Union's removing his name from his produced work.

70.      On June 9, 2020, Bangert ordered Webster to complete the Scenarios assignment the same day. Webster worked all night to complete the task.

71.      That same day, Aspell sent an email to Webster in which he reprimanded Webster for his email to the Finance Committee. In the same email, Aspell also reiterated the Credit Union's purported concerns with Webster's performance.

72.      On or about June 9, 2020, Webster received a Written Warning from Bangert.

73.      On or about June 11, 2020, Webster held meetings with Bangert, Aspell, and Kuhn to discuss Bangert and Aspell's concerns, as well as Webster's concerns about what he perceived as ongoing retaliatory actions of the Credit Union.

74.      During the meetings, Webster informed management that its behavior toward him constituted discrimination and retaliation.

75.      The meeting participants agreed to adjust Webster's twice-daily email requirement to once-daily.

76.      Webster requested details on the specific actions that warranted his written warning. Bangert and Aspell refused to provide details, and they stated that Webster would only use the information to refute the accusations.

77.      In or about June 2020, Webster noticed that the Credit Union excluded him from meetings that related to topics relevant to his job function.

78.      On or about June 17, 2020, the Credit Union held a meeting to discuss a "Deposit Strategy." Webster had drafted this strategy, yet the Credit Union omitted him from the meeting.

79.     On or around July 17, 2020, Aspell sent Webster a four-page document with a list of errors in materials that Webster and Vandara prepared and reviewed for a Finance Committee meeting. The document consisted primarily of immaterial errors.

80.     On July 31, 2020, Bangert issued Webster a Final Warning.

81.     On or about August 13, 2020, Aspell sent an email late in the evening requesting that Webster create an ALCO presentation by "today/tomorrow".  Webster worked through the night to complete the assignment.

82.     On or about August 26, 2020, Vazquez instructed Webster to move beyond "past" difficulties and work closely with Bangert to meet a series of aggressive goals for the Finance Committee.

83.     Over the next three weeks, Webster worked weekends and through the night on multiple occasions to achieve the goals that were set for the Finance Committee meeting on September 17, 2020.

84.     On or about October 5, 2020, Vazquez, D'Annunzio, Aspell, and Bangert informed Webster that a recommendation from Aspell to plug different assumptions into the financial models managed by Webster would be discussed in an ALCO meeting taking place in two days.  Webster requested additional details about the recommendation, as well as a copy of a presentation. Webster received a copy late the following day.  After he reviewed the presentation, Webster informed Bangert that he had concerns about its content.

85.     During the ALCO meeting that occurred on October 7, 2020, Vazquez berated Webster when Webster attempted to provide the Committee with a refresher on relevant ALM concepts.  Later in the meeting, D'Annunzio also raised his voice at Webster when Webster raised questions about the presentation.  During the meeting, Webster commented that the Chief

Risk Officer had been omitted from the meeting invitation.  The meeting did not conclude in the allotted time, and a follow-up meeting was scheduled for October 9, 2020.

86.     On or about October 8, 2020 and the morning of October 9, 2020, Webster informed Bangert that he still had substantive concerns about the recommendation.

87.     On or about October 9, 2020, at the conclusion of the presentation in ALCO, Webster informed the committee that he still had substantive concerns and could not endorse the recommendation.  Webster's endorsement was not required for the recommendation to be advanced to the Finance Committee, but Vazquez singled out Webster and instructed him to work overnight and through the weekend to enumerate what Webster would require to endorse the recommendation.

88.     Then, on or about October 9, 2020, after the conclusion of the ALCO meeting, Vazquez informed Webster that if he received anything in writing from Webster on this topic, he would consider it insubordination.  Vazquez then instructed D'Annunzio and Bangert to work with Webster to change Webster's position on the recommendation that evening.

89.     Discussions between D'Annunzio, Bangert, and Webster continued into the following day, Saturday, October 10, 2020.  Webster stated that as the ALM Manager, he could not provide his endorsement because the ALM Manager had not been permitted to perform his job function.  One of Webster's primary job duties as ALM Manager is to oversee the models.  In this instance, Vazquez, D'Annunzio, Aspell, and Bangert made significant changes to the model without permitting Webster to participate in that process.  D'Annunzio stated that he would consider this a failure by Webster to be proactive in the execution of his job responsibilities, even though it was Webster's management team who instructed Webster to work on other

projects instead of the model change project and declined to provide Webster with the data regarding the model changes.

90.      As of October 15, 2020, Bangert had not provided Webster with his midyear goal and performance review for 2020, even though HR mandates that these reviews be completed before June 30, 2020 and discussed with employees prior to July 31, 2020.

91.      As the result of BFSFCU's illegal conduct, Webster has sustained economic damages and mental anguish and will continue to sustain damages into the future.

## COUNT I
### Interference
### D.C. Family Medical Leave Act
### D.C. Code §§ 32-501, *et seq.*

92.      Webster incorporates the allegations set forth in the preceding paragraphs as though fully alleged herein.

93.      Webster was a "covered employee" within the meaning of the DCFMLA at the time he took leave, as he had worked for the same employer for more than one year and had worked more than 1,000 hours in the 12 months prior to the time he requested the leave. D.C. Code § 32-501(1).

94.      Bank-Fund Staff Federal Credit Union was an "employer" within the meaning of the DCFMLA at the time of Webster's leave. D.C. Code § 32-501(2).

95.      Bank-Fund Staff Federal Credit Union was a "covered employer" within the meaning of the DCFMLA at the time of Webster's leave because it employed more than 20 people within the District of Columbia. D.C. Mun. Regs. Title 4, § 4-1601.

96.      BFSFCU interfered with Webster's rights under the DCFMLA when it required Webster to seek a second opinion almost one-month after it approved the medical leave.

97.     BFSFCU interfered with Webster's rights under the DCFMLA when it unilaterally shortened Webster's medical leave by a month in December 2019.

98.     Webster suffered prejudice as a result of BFSFCU's actions.

99.     Webster is entitled to such legal or equitable relief as will effectuate the purposes of the statute.

## COUNT II
### Retaliation
### D.C. Family Medical Leave Act
### D.C. Code §§ 32-501, *et seq.*

100.     Webster incorporates the allegations set forth in the preceding paragraphs as though fully alleged herein.

101.     Webster was a "covered employee" within the meaning of the DCFMLA at the time he took leave, as he had worked for the same employer for more than one year and had worked more than 1,000 hours in the 12 months prior to the time he requested the leave. D.C. Code § 32-501(1).

102.     Bank-Fund Staff Federal Credit Union was an "employer" within the meaning of the DCFMLA at the time of Webster's leave. D.C. Code § 32-501(2).

103.     Bank-Fund Staff Federal Credit Union was a "covered employer" within the meaning of the DCFMLA at the time of Webster's leave because it employed more than 20 people within the District of Columbia. D.C. Mun. Regs. Title 4, § 4-1601.

104.     During his employment with BFSFCU, Webster exercised his right under the DCFMLA to take leave, which is protected activity under the DCFMLA.

105.     BFSFCU took an adverse employment action against Webster when it required Webster to seek a second opinion almost one-month after it approved the medical leave.

106.     BFSFCU took an adverse employment action against Webster when it unilaterally shortened Webster's medical leave by a month in December 2019.

107.     BFSFCU took an adverse employment action against Webster when it lowered Webster's performance review in December 2019.

108.     BFSFCU took an adverse employment action against Webster when it denied Webster a merit increase in December 2019.

109.     BFSFCU took an adverse employment action against Webster when it awarded Webster a substantially lower bonus in December 2019.

110.     Webster engaged in protected activity under the DCFMLA in January 2020 and February 2020 when he complained to Charles Bangert and Jennifer Kuhn that he believed his lowered performance review, as well as the lack of merit increase and substantially lower bonus that flowed from it, were retaliation for his use of medical leave.

111.     BFSFCU took an adverse employment action against Webster when it sustained the lowered performance review, lack of merit increase, and substantially lower bonus in February 2020.

112.     Webster engaged in protected activity under the DCFMLA in May 2020 when he informed BFSFCU of his intention to file suit for violations of DCFMLA and DCHRA.

113.     Webster engaged in protected activity under the DCFMLA in June 2020 when he informed his managers during a meeting that their actions were discriminatory and retaliatory.

114.     BFSFCU took an adverse employment action against Webster when it required Webster to submit daily check-in emails to Bangert.

115.     BFSFCU took an adverse employment action against Webster when it denied Webster access to his office.

116.     BFSFCU took an adverse employment action against Webster when it administered a Written Warning to Webster.

117.     BFSFCU took an adverse employment action against Webster when it administered a Final Warning to Webster.

118.     BFSFCU also took adverse employment actions against Webster in late September and early October 2020 when its managers threatened Webster's job after he raised objections that were a part of his duties.

119.     BFSFCU retaliated against Webster because he exercised his rights under the DCFMLA.

120.     BFSFCU's adverse actions occurred shortly after Webster's protected activity, and BFSFCU reaffirmed its adverse actions after Webster's internal complaints of discrimination and retaliation.

121.     BFSFCU, through Bangert, affirmed a link between Webster's use of medical leave and the lowered performance review, lack of merit increase, and lowered bonus.

122.     BFSFCU's stated reasons for the actions it took are pretext to cover BFSFCU's retaliatory actions.

123.     As a result of BFSFCU's actions, Webster has suffered damages and emotional distress.

124.     Webster is entitled to such legal or equitable relief as will effectuate the purposes of the statute.

## COUNT III
**Disability Discrimination**
**D.C. Human Rights Act**
**D.C. Code §§ 2-1401, *et seq.***

125.      Webster incorporates the allegations set forth in the preceding paragraphs as fully alleged herein.

126.      At all times relevant to this complaint, BFSFCU was an "employer" as defined in D.C. Code § 2-1401.02(9).

127.      Webster is a member of a protected class because has a "disability" as defined in D.C. Code § 2-1401.02(5A).

128.      At all times relevant to this complaint, Webster has been qualified to perform the essential functions of his job and has performed those essential functions successfully.

129.      BFSFCU took an adverse employment action against Webster when it required Webster to seek a second opinion almost one-month after it approved the medical leave.

130.      BFSFCU took an adverse employment action against Webster when it unilaterally shortened Webster's medical leave by a month in December 2019.

131.      BFSFCU took an adverse employment action against Webster when it lowered Webster's performance review in December 2019.

132.      BFSFCU took an adverse employment action against Webster when it denied Webster a merit increase in December 2019.

133.      BFSFCU took an adverse employment action against Webster when it awarded Webster a substantially lower bonus in December 2019.

134.      BFSFCU took an adverse employment action against Webster when it sustained the lowered performance review, lack of merit increase, and substantially lower bonus in February 2020.

135.    BFSFCU took an adverse employment action against Webster when it required Webster to submit daily check-in emails to Bangert.

136.    BFSFCU took an adverse employment action against Webster when it denied Webster access to his office.

137.    BFSFCU took an adverse employment action against Webster when it administered a Written Warning to Webster.

138.    BFSFCU took an adverse employment action against Webster when it administered a Final Warning to Webster.

139.    BFSFCU also took adverse employment actions against Webster in late September and early October 2020 when its managers threatened Webster's job after he raised objections that were a part of his duties.

140.    BFSFCU's actions raise an inference of unlawful discrimination based on Webster's disability. BFSFCU took actions that directly impaired the medical leave that Webster took because of his disability.

141.    Webster's supervisor specifically referenced the leave as a justification for the lowered performance review, which led to a lower bonus and the absence of a merit increase for Webster.

142.    BFSFCU did not take similar actions against non-disabled employees.

143.    BFSFCU's stated reasons for the actions it took are pretext to cover BFSFCU's discriminatory actions.

144.    As a result of BFSFCU's actions, Webster has suffered damages and emotional distress.

145.     Webster is entitled to such legal or equitable relief as will effectuate the purposes of the statute.

**COUNT IV**
**Retaliation**
**D.C. Human Rights Act**
**D.C. Code §§ 2-1401, *et seq.***

146.     Webster incorporates the allegations set forth in the preceding paragraphs as fully alleged herein.

147.     At all times relevant to this complaint, BFSFCU was an "employer" as defined in D.C. Code § 2-1401.02(9).

148.     Webster engaged in protected activity under the DCHRA when he took medical leave, as approved by his management, for a disability.

149.     Webster engaged in protected activity under the DCHRA in January 2020 and February 2020 when he complained to Charles Bangert and Jennifer Kuhn that he believed his lowered performance review, as well as the lack of merit increase and substantially lower bonus that flowed from it, all had their basis in his use of medical leave for a disability.

150.     BFSFCU took an adverse employment action against Webster when it required Webster to seek a second opinion almost one-month after it approved the medical leave.

151.     BFSFCU took an adverse employment action against Webster when it unilaterally shortened Webster's medical leave by a month in December 2019.

152.     BFSFCU took an adverse employment action against Webster when it lowered Webster's performance review in December 2019.

153.     BFSFCU took an adverse employment action against Webster when it denied Webster a merit increase in December 2019.

154.     BFSFCU took an adverse employment action against Webster when it awarded Webster a substantially lower bonus in December 2019.

155.     Webster engaged in protected activity under the DCHRA in May 2020 when he informed BFSFCU of his intention to file suit for violations of DCFMLA and DCHRA.

156.     Webster engaged in protected activity under the DCHRA in June 2020 when he informed his managers during a meeting that their actions were discriminatory and retaliatory.

157.     BFSFCU took an adverse employment action against Webster when it required Webster to submit daily check-in emails to Bangert.

158.     BFSFCU took an adverse employment action against Webster when it denied Webster access to his office.

159.     BFSFCU took an adverse employment action against Webster when it administered a Written Warning to Webster.

160.     BFSFCU took an adverse employment action against Webster when it administered a Final Warning to Webster.

161.     BFSFCU also took adverse employment actions against Webster in late September and early October 2020 when its managers threatened Webster's job after he raised objections that were a part of his duties.

162.     BFSFCU's adverse employment actions occurred shortly after Webster's initial protected activity, and BFSFCU reaffirmed its adverse actions after Webster's internal complaints of discrimination and retaliation.

163.     BFSFCU's stated reasons for the actions it took are pretext to cover BFSFCU's retaliatory actions.

164.     As a result of BFSFCU's actions, Webster has suffered damages and emotional distress.

165.     Webster is entitled to such legal or equitable relief as will effectuate the purposes of the statute.

### COUNT V
**Retaliation**
**Federal Credit Union Act**
**12 U.S.C. § 1790b(a)(1), *et seq.***

166.     Webster incorporates the allegations set forth in the preceding paragraphs as fully alleged herein.

167.     Webster engaged in protected activity under the FCUA in April 2020 when he submitted a complaint to the National Credit Union Administration for violations by BFSFCU of the Federal Credit Union Act

168.     BFSFCU took an adverse employment action against Webster when it required Webster to submit daily check-in emails to Bangert.

169.     BFSFCU took an adverse employment action against Webster when it denied Webster access to his office.

170.     BFSFCU took an adverse employment action against Webster when it administered a Written Warning to Webster.

171.     BFSFCU took an adverse employment action against Webster when it administered a Final Warning to Webster.

172.     BFSFCU also took adverse employment actions against Webster in late September and early October 2020 when its managers threatened Webster's job after he raised objections that were a part of his duties.

173.     BFSFCU's actions occurred in close proximity to Webster's complaint to the NCUA and to an audit conducted by the NCUA, which raises an inference of retaliation. Additionally, BFSFCU had taken action against Webster prior to his filing of the complaint with the NCUA after Webster had made internal disclosures about concerns of impropriety within the Credit Union.

174.     As a result of BFSFCU's actions, Webster has suffered damages and emotional distress.

175.     Webster is entitled to such legal or equitable relief as will effectuate the purposes of the statute.

## PRAYER FOR RELIEF

Based on the foregoing claims, Webster respectfully requests the Court enter judgment in his favor and award him the following relief:

a.  Economic damages for lost wages and benefits;

b.  Equitable relief;

c.  Pre-judgment interest;

d.  Compensatory (non-economic) damages, including damages for mental and emotional distress and harm to reputation;

e.  Liquidated damages for all claims under which liquidated damages can be awarded;

f.  Punitive damages as may be determined at trial for all claims under which punitive damages can be awarded;

g.  Costs and reasonable attorneys' fees; and

h.  Any other just and equitable relief this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

R. Scott Oswald (DC Bar: 458859)
Andrew D. Howell (DC Bar:155355)
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2829
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
dhowell@employmentlawgroup.com
*Counsel for the Plaintiff*